## IN ADMIRALTY.

## NATHANIEL H. EDWARDS *vs.* WILLIAM STOTT.

A charge of general bad treatment, made by a seaman against the master, cannot be sustained upon the vague statements of some of the crew that the master was " cross," or " pretty harsh," or " rather domineering."

In case of disobedience, disrespectful, or disorderly conduct, the master may lawfully correct those under his command, in a reasonable manner; but the master must be careful in the exercise of his power, and not make it a pretext for cruelty or oppression.

JUDGE ROBERTSON, acting as Chief Justice, pronounced judgment as follows:

The libellant in this suit, which is one of the denomination technically called a cause of damage, was lately second officer on board of the American ship " Nile," whereof the respondent was, at the same time, master. The libel sets forth, in substance, that the libellant shipped on board the ship " Nile," at Honolulu, in the month of April last, for a trading voyage to the North West and back to Honolulu, or to some port in the United States; that the " Nile " sailed from Honolulu about the 17th of April, and returned about the 18th of July; that during the voyage the treatment of the libellant by the respondent, was severe, harsh, unlawful and arbitrary, and not such as is due from a ship master to his second officer; that about ten days previous to the ship's arrival at Honolulu, while on her return voyage, the respondent became angry with the libellant about some piece of work, on which the crew were employed, not being finished so speedily as the respondent expected, and that after some words had passed between the parties the respondent caught the libellant by the throat and dashed him down on the deck, seized him by one of his ancles and stamped on his face with one of his, the respondent's feet; wherefore, the libellant brings this suit, laying his damages at one thousand dollars.

The respondent, in his answer, denies the libellant's general allegation of harsh, severe and arbitrary treatment; charges the libellant with being negligent in the discharge of his duty, and with using insolent and disrespectful language to the respondent on the particular occasion referred to, and persisting in doing so, after being repeatedly ordered to desist. The respondent states, further, that feeling it necessary to coerce the libellant into obedience, he took hold of him, whereupon, in stepping back, the libellant fell over some obstruction upon the deck, when the respondent seized the libellant and held him for a short time by one of his heels, to prevent him from kicking; but the respondent denies that while the libellant was down on the deck, he, the respondent, stamped on the libellant's face, or injured him in any way.

The witnesses produced for the libellant, agree, in the main, in their statements touching the charge of general harsh treatment. One witness characterizes the language of the respondent. as being cross and rough, but says that he used no worse language to the libellant than to others. Another says, the captain's treatment of the

libellant appeared to be pretty harsh, and that the captain was harsher to the officers than he was to the hands. One of the witnesses thought the captain did not treat the libellant as a second officer ought to be treated; and another says the captain was rather domineering.

The testimony of the respondent's witnesses, one of whom was the owner and supercargo, and the other a passenger, conflicts with that of the libellant's witnesses as to the general treatment of his officers, by the respondent. The supercargo states that he is familiar with sea life and manners, and that he never observed anything unusual in the respondent's language or treatment of his officers or crew. The other witness, who was a passenger, says, Captain Stott may have used profane language, at times, but he never treated any of his officers improperly, or unkindly, during the voyage.

We consider the grave charge of general bad treatment, made by the libellant against the respondent, as altogether unfounded. Taking the testimony of the seamen, who gave evidence on behalf of the libellant, as correct, it amounts to nothing like a sufficient foundation for a serious complaint. We presume no court of Admiralty in the world would entertain for a moment the serious charge made by the libellant in this case, merely upon the declaration of some of the crew that the master of the ship was " cross," or " pretty harsh," or "rather domineering." Unless the evidence is such as will give to these vague allegations, a definite shape, a tangible form, they are wholly unworthy of attention. In a case adjudicated in the High Court of Admiralty in England, Lord Stowell said : " It will not be sufficient that there has been a want of that personal attention and civility which usually takes place on other occasions, and might be wished, generally, to attend the exercise of authority. The nature of the service requires, that those persons who engage in it should accommodate themselves to the circumstances attending it; and those circumstances are, not unfrequently, urgent, and create strong sensations, which naturally find their way in strong expressions and violent demeanor. The persons subject to this species of authority are not to be captious, or to take exception to a neglect of formal and ceremonious observances of behavior." The Exeter, 2 C. Rob: p. 264. If the seamen of ninety-nine, out of every hundred ships, in this ocean, were asked the same questions touching the conduct of their masters, that these seamen of the "Nile," were asked, their answers would, we doubt not, be almost identical.

If the libellant, then, has any just cause of action, it is upon the assault and battery committed upon him by the respondent, on the return voyage. Let us see what the evidence upon that part of the case amounts to.

It appears, that one afternoon, the men of the second officer's watch were allowed to quit work and go below, at 4 o'clock, which was against the captain's wishes, and according to the testimony of some of the witnesses, contrary to his orders also. Next morning, the captain found fault with the second officer about this matter, and he excused himself by placing the responsibility on the mate, who, he said, had given the order to quit work. Discordant words ensued between the captain and the officer, the latter grumbling and saying that he had never been so badly treated on board of any ship before. This conversation is said to have continued as long as fifteen minutes,

during which, according to the testimony of the supercargo, the captain kept his temper and repeatedly desired the officer to desist, or to stop his talk, which he did for a few minutes, and then commenced again in the same strain, when the captain becoming irritated, walked up to the officer, seized him by the throat, or one of his arms, it does not clearly appear which, and the officer either tripped and fell backwards, or was thrown down by the captain, on the deck. There is a disagreement between the testimony of the libellant's witnesses and that of the supercargo, as to whether or not the respondent stamped on the libellant's face, while he was down. The supercargo states that he clearly saw the whole affair from the opposite side of the deck; that he did not see the respondent stamp on the libellant, or injure him in any way, while he was down, but he merely held him by one of his ancles for a few minutes, and then allowed him to get up, and that he saw no appearance of fresh injury afterwards, on the libellant's face, nor did he seem to have received any visible injury whatever. On the other hand, the witnesses for the libellant state that, while he was down, the respondent did put his heel in the libellant's face, and that they observed, after the scuffle was over, that a bit of skin had been scraped off the upper part of the libellant's nose; but none of them saw any blood flow from it. The witnesses all agree in saying that the libellant, after the scuffle was over, went immediately about his work, as usual, and no one pretends that he suffered anything like a serious bodily injury.

The question we have to decide is, in view of all the facts, did the respondent, in this transaction, commit an abuse of his authority as master of the ship ? Because, if he did so, he is responsible to the libellant to the extent of the injury sustained by him. We would remark here, that the reasoning and arguments so strenuously put forth by the counsel for the libellant, would, in our opinion, have been much more appropriate, and would have fallen with greater force, on a prosecution for an assault and battery, committed by one citizen upon another, on shore, than when applied to such a case as the present. We think there is a wide distinction between a collision such as that which took place, on the high seas, between the master of the "Nile" and his second officer, and, for instance, a similar collision on shore, between a master mechanic and one of his workmen. The relations of the parties are widely different, as are the laws by which their contracts are governed. The authority and power of the master of a ship are, perhaps, without a parallel in any of the other relations of life. In case of disobedience, disrespectful, or disorderly conduct, he may lawfully correct those under his command in a reasonable manner; his authority in this respect being analogous to that of a parent over his child, or of a master over his apprentice or scholar. Such an authority is absolutely necessary to the safety of the ship, and of the lives of the persons on board. But it behooves the master to be very careful in the exercise of it, and not to make his parental power a pretext for cruelty and oppression. Abbott on Ship., p. 232; Conkling's U. S. Adm., pp. 314, 315.

On carefully considering the circumstances of the case before us, we are decidedly of the opinion that the libellant has failed to establish such a stretch of authority or such an abuse of power on the part of the respondent, as would warrant this court in awarding more

x

than nominal damages against him. It can scarcely be said that the act of the respondent exceeded the amount of correction allowed to be administered to a seaman by the ancient laws of Oleron, viz: a single stroke of the fist. It would be impossible for the court, in judging of such a case as the present, to measure the exercise of authority on the part of the master, with all the nicety which would be necessary in the operation of splitting a hair, perplexed as we are in some degree, by the conflicting nature of the testimony. And we would remark here, that there is one circumstance that tends, in our opinion, to throw some doubt upon the testimony of the libellant's witnesses, on a material point. They say that the respondent put his heel in the libellant's face while he lay on deck, and one of them says the libellant stated, after the scuffle was over, that the mark on his nose was made by the respondent's foot. It does not appear that these witnesses had any better opportunities of seeing what took place than the supercargo had, and he states that he did not see the respondent use his foot on the libellant nor did he observe any mark upon the libellant's face, other than those he had observed on it previously, and which were occasioned by eruptions in the skin, to which the libellant was subject during the voyage. It appears, to us, almost incredible, that a man of the physical weight and strength of the respondent, could have used his heel upon the face of the libellant, even once, in the way alleged by him, without having made an impression, of such a marked distinction, as to preclude all possibility of doubt or diversity of opinion, in the minds of those who witnessed the transaction, as to how the impression was made.

This was one of those collisions which are of almost daily occurrence at sea, in the preliminaries that lead to which neither party is, in general, altogether blameless. In judging of a case like that now before us, the peculiar situation of the parties must not be lost sight of. We must not forget that the position of the master of a ship, at sea, is one of command, while it is the duty of others to obey all his lawful orders. The master of a ship who knows and keeps his proper place, has no equal on board. He exercises supreme control, in all that relates to the management and discipline of the vessel and crew, being responsible, however, for any excess or abuse of his authority. When the libellant, on the occasion referred to, was desired by the respondent to cease his irritating speech, he ought, we think, to have done so, and a personal collision would then have been averted. "It is the duty of seamen to bear even the ill temper of the master, and to get out of his way, when instances of passion occur." Consulato del mare, 16—cited in Thorne *vs.* White, 1 Peter's Ad. Dec. 171. In the case just cited, Judge Peters said, "subordination is peculiarly essential to be enforced among a class of men whose manners and habits partake of the attributes of the element, on which they are employed. I have never bound over a master for correcting a sailor, unless cruelty was exercised, or improper weapons used." "The duties of the mariners and the master are reciprocal: from the former are due obedience and respect, from the latter protection and good treatment." Abbott on Ship., p. 229.

We are well aware that the kind of authority vested in the master of a ship, is peculiarly liable to abuse, and that such abuse is of too frequent occurrence; but it is necessary, before a court of admiralty

can, with due regard to the safety of the interests of commerce and navigation, proceed to punish such abuse, that it be established in evidence with perfect clearness and certainty. As the present is the first suit of this description that has come up for judgment in this court, we deem it right to say here that, while the ear of this court will ever be found open to hear the complaints of all, without respect of persons, from the master of the largest clipper ship that floats on the broad bosom of the Pacific, to the youngest after-oarsman in the whaling fleet, we would deprecate having our time occupied, to any great extent, in the investigation of exaggerated charges, based upon frivolous grounds. Whenever a clear case of abuse or oppression is made out, to our satisfaction, we shall endeavor to mete out a just measure of redress to the injured party, however humble he may be.

We must say that, on a calm review of all the circumstances of case, we think they are not such as to warrant the court in awarding more than nominal damages in favor of the libellant.

Judgment for libellant, for one dollar and the costs.

Mr. Hinton for libellant.

Mr. Bates for respondent.

Honolulu, Aug. 24, 1855.

Note.—See Clark *vs.* Jagger, January Term, 1854; also Dodge *vs.* Hempstead and Hepington, December, 1856.